**Alvin K. GRAY, Plaintiff,**

v.

**Gordon FAULKNER; Jack R. Duckworth; and William Hartley, Defendants.**

**No. S86–172 (RLM).**

United States District Court,
N.D. Indiana,
South Bend Division.

Dec. 30, 1992.

---

---

David W. Albert, South Bend, IN, for plaintiff.

David L. Steiner, Deputy Atty. Gen., Indianapolis, IN, for defendants.

## MEMORANDUM AND ORDER

MILLER, District Judge.

This cause, the oldest on this judge's docket, is before the court on the parties' cross-motions for summary judgment. For the following reasons, the court finds that the plaintiff's motion was untimely and, therefore, must be stricken, and the defendants' motion must be granted in part and denied in part.

### I.

Mr. Gray brings this suit under 42 U.S.C. § 1983 alleging that the defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution. The defendants in this case are former Indiana Department of Correction Commissioner Gordon Faulkner, former Indiana State Prison ("ISP") Superintendent Jack Duckworth, and ISP Director of Classification William Hartley. Mr. Gray seeks both monetary and injunctive relief. The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Mr. Gray has been an ISP inmate since 1981. In July 1983, Mr. Gray was placed in the A & O unit pursuant to his request for placement in protective custody. The A & O unit was segregated from other areas of the prison, and the A & O inmates' movements were restricted to prevent contact with inmates in the general population. Mr. Gray worked as a porter while in the A & O unit. He was outside his cell each day from 6:00 a.m. to 4:00 p.m.

Mr. Gray alleges that another inmate, Chris Averhart, assaulted him on February 24, 1984. Mr. Averhart, a death row inmate, was being held in the A & O unit for a few hours along with other inmates ordinarily housed on death row. Mr. Gray claims that Mr. Averhart struck him and knocked him unconscious. No correctional officer observed the alleged assault. Mr. Gray alleges that he was injured and that he met with a doctor.

Mr. Gray also alleges that on September 7, 1984, an inmate named Hegewood, who was housed in the A & O unit, tried to sexually assault Mr. Gray. When Mr. Gray resisted and broke away, Mr. Hegewood followed Mr. Gray and struck him repeatedly. As many as eight or nine correctional officers arrived in the A & O unit to stop the assault.

After the September 1984 incident, Mr. Gray became interested in filing a lawsuit, but A & O inmates were not permitted to physically travel to the inmate law library. Instead, inmates with experience in legal matters were assigned to visit the A & O unit and assist A & O inmates in obtaining any legal materials they needed from the law library.

In June 1985, Mr. Gray was transferred to F dorm, where an inmate named Jerry Forbes assisted Mr. Gray in filing this lawsuit. Mr. Gray stated that Mr. Forbes appeared to have legal knowledge and told Mr. Gray what items to request from the "Writ room". With Mr. Forbes' help, Mr. Gray filed this action in 1986.

Mr. Gray was housed in F dorm until June 1988. Since then, Mr. Gray has been housed in the disciplinary segregation unit and in the general inmate population. Mr. Gray has been in the general inmate population since April 1992.

Both parties have filed a motion for summary judgment.

### II.

 A party seeking summary judgment must demonstrate that no genuine issue of fact exists for trial and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Duane v. Lane*, 959 F.2d 673, 675 (7th Cir.1992). If that showing is made and the motion's opponent would bear the burden at trial on the matter that forms the basis of the motion, the opponent must come forth with

evidence to show what facts are in actual dispute. *Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If he fails to do so, summary judgment is proper. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir.1990). A genuine factual issue exists only when there is sufficient evidence for a jury to return a verdict for the motion's opponent. *Harbor House Condominium Ass'n v. Massachusetts Bay Ins. Co.*, 915 F.2d 316, 320 (7th Cir.1990). Summary judgment should be granted if no reasonable jury could return a verdict for the motion's opponent. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

■ The parties cannot rest on mere allegations in the pleadings, *Hughes v. Joliet Correctional Center*, 931 F.2d 425, 428 (7th Cir.1991), or upon conclusory allegations in affidavits. *Cusson–Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992). The court must construe the facts as favorably to the non-moving party as the record will permit, *Brennan v. Daley*, 929 F.2d 346, 348 (7th Cir.1991), and draw any permissible inferences from the materials before it in favor of the non-moving party, *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Prince v. Zazove*, 959 F.2d 1395, 1398 (7th Cir.1992), as long as the inferences are reasonable. *Bank Leumi Le–Israel, B.M. v. Lee*, 928 F.2d 232, 236 (7th Cir.1991). The non-moving party must show that the disputed fact is material, or outcome-determinative, under applicable law. *Kizer v. Children's Learning Center*, 962 F.2d 608, 611 (7th Cir.1992).

As stated above, Mr. Gray seeks both injunctive and monetary relief under 42 U.S.C. § 1983, alleging that the defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution.

### III.

#### A. Injunctive Relief

The defendants claim that Mr. Gray's claims for injunctive relief relating to his access to legal materials or relating to conditions in the A & O unit are moot because Mr. Gray has not been housed in protective custody since 1988.[1] Mr. Gray currently is not subject to any restrictions of protective custody and has access to the law library.

■ A federal court has no jurisdiction to consider a claim in the absence of a case or controversy. U.S. Const. art. III; *Honig v. Doer*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). A case is deemed moot when there is no longer a case or controversy. *DeFunis v. Odegard*, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974); *Central Soya Co. v. Consolidated Rail Corp.*, 614 F.2d 684, 686–87 (7th Cir.1980). The defendants contend that Mr. Gray's request for injunctive relief is moot because Mr. Gray no longer is in protective custody, and because none of the defendants are in a position to enforce the injunctive relief.

■ Mr. Gray concedes that the issue concerning injunctive relief for access to the law library is moot. *See* Plaintiff's Resp.Brief, p. 19. His other claims relating to conditions in the A & O unit are also moot because Mr. Gray has not been housed in protective custody since 1988, and there has been no showing that Mr. Gray will again be subject to the challenged action. *See Martin v. Davies*, 917 F.2d 336, 339 (7th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2805, 115 L.Ed.2d 978 (1991).

#### B. Official Capacity Claims

The defendants maintain that Mr. Gray's claims for damages against them in their

[1]. Mr. Gray sought injunctive relief (1) prohibiting the defendants from confining him in the A & O unit while death row inmates were present; (2) prohibiting the defendants from refusing him medical treatment for the assaults alleged in the complaint; (3) prohibiting the defendants from refusing him access to recreation, hobby crafts, educational programs, and full commissary privileges enjoyed by inmates in the general prison population; and (4) prohibiting the defendants from refusing him access to the prison law library.

official capacities must be denied pursuant to the Eleventh Amendment to the United States Constitution, which provides:

> The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign state.

■ Under the Supreme Court's construction of this amendment, states are immune from suits by their own citizens as well as suits by citizens of other states. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984); *Employees v. Missouri Dept. of Public Health and Welfare,* 411 U.S. 279, 280, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973).

The Supreme Court has stated that the Eleventh Amendment:

> ... deprives the federal court of power to decide certain claims against the states that otherwise would be within the scope of Art. III's grant of jurisdiction. For example, if a lawsuit against state officials under 42 U.S.C. § 1983 alleges a constitutional claim, the federal court is barred from awarding damages against the state treasury even though the claim arises under the Constitution.

*Pennhurst State School and Hospital v. Halderman,* 465 U.S. at 119–120, 104 S.Ct. at 918.

■ No claim for damages may be brought against the state that has not waived its immunity. *Welch v. Texas Dept. of Highways and Public Transportation,* 483 U.S. 468, 473, 107 S.Ct. 2941, 2946, 97 L.Ed.2d 389 (1987) (plurality opinion). Mr. Gray has not shown, and the court does not find, that the State of Indiana has waived its Eleventh Amendment immunity and consented to suits of this nature. *See Meadows v. State of Indiana,* 854 F.2d 1068 (7th Cir.1988).

■ The Eleventh Amendment also bars official capacity suits against state officials because the state is the real party in interest. *Meadows v. State of Indiana,* 854 F.2d at 1069. Thus, defendants Faulkner,

Duckworth, and Hartley, in their official capacities, are immune from damages claims. *Kentucky v. Graham,* 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985); *Meadows v. State of Indiana,* 854 F.2d at 1069; *Duckworth v. Franzen,* 780 F.2d 645 (7th Cir.1985), *cert. denied,* 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

### C. Individual Capacity Claims
#### 1. First Amendment

Mr. Gray contends that a question of material fact exists regarding his First Amendment claim that the defendants violated his right of access to the courts. Before addressing the merits of the present case, a brief background into the Seventh Circuit's caselaw governing an inmate's right to access to the courts is necessary.

■ An inmate's right of access to the courts is the most fundamental of his rights. *Jenkins v. Lane,* 977 F.2d 266, 268 (7th Cir.1992). Without a right of access to the courts, all other rights an inmate may possess are illusory, being "entirely dependent for their existence on the whim or caprice of the prison warden." *Jenkins v. Lane,* 977 F.2d at 268 (quoting *Adams v. Carlson,* 488 F.2d 619, 630 (7th Cir.1973)); *DeMallory v. Cullen,* 855 F.2d 442, 446 (7th Cir.1988). The right of access, however, in not unconditional. *Campbell v. Miller,* 787 F.2d 217, 226 (7th Cir.), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1986). The constitutional benchmark is meaningful, not unlimited, access. *Campbell v. Miller,* 787 F.2d at 226.

In *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977), the Supreme Court held that the constitutional right of access to the courts "requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Prison officials have an affirmative duty to provide inmates with reasonable access to the courts, and also bear the burden of

proving the adequacy of the means they provide. *Shango v. Jurich,* 965 F.2d 289, 292 (7th Cir.1992); *DeMallory v. Cullen,* 855 F.2d at 446; *Campbell v. Miller,* 787 F.2d at 225–26.

The only time period during which Mr. Gray can claim that he was denied access to the courts was during his time in the A & O unit. Mr. Gray was transferred from the A & O unit in either 1985 or 1986.[2] After his transfer to F Dorm, Mr. Gray met Mr. Forbes, who then helped him with legal matters. Mr. Gray stated that after he talked to Mr. Forbes, he had no reason to ask anyone from the Writ room to help him with his cases. He also stated that Mr. Forbes informed him of the books or documents that he should request from the Writ room. When Mr. Gray made these requests, the Writ room provided him with the information most of the time. *See* Gray Dep., pp. 69–72. After being transferred to F Dormitory, Mr. Gray cannot complain of not having access to the library because he never asked anyone in the Writ room to provide assistance, and he received the materials he requested.

Thus, the only remaining question is whether Mr. Gray was deprived access to the courts while housed in the A & O unit.

The Seventh Circuit has struggled to develop a framework for analysis of claims of this kind. Most recently, in *Jenkins v. Lane,* 977 F.2d 266, the court articulated a two-prong test. First, "the inmate must show that prison officials failed 'to assist in the preparation and filing of mean-

ingful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" 977 F.2d at 268; *accord, Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Martin v. Davies,* 917 F.2d 336, 338 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2805, 115 L.Ed.2d 978 (1991). Second, the inmate must show "some quantum of detriment caused by the challenged conduct of state officials resulting in the interruption and/or delay of the plaintiff's pending or contemplated litigation." *Shango v. Jurich,* 965 F.2d 289.

The defendants correctly note that Mr. Gray has not shown any prejudice or conduct resulting in the interruption and/or delay of his pending or contemplated litigation, and therefore, he has not satisfied the second prong of the test. *See Jenkins v. Lane,* 977 F.2d at 269; *Shango v. Jurich,* 965 F.2d at 292. For example, Mr. Gray filed this case in a timely fashion and the pleadings in this case contain numerous relevant case citations. Even if Mr. Gray had access to the law library, nothing in the record demonstrates that his pleadings would have been different.

The *Jenkins* court also held, however, that if the limitation on legal materials was direct, substantial, and continuous, the requirement of the second prong of the test is waived, and the inmate need not show prejudice to prevail. *Jenkins v. Lane,* 977 F.2d at 268.[3] Because the evidence before

---

**2.** At his deposition, Mr. Gray testified that he was transferred from the A & O unit to the F Dormitory in both 1985 (*see* Gray Dep., p. 71) and 1986 (*see* Gray Dep., p. 60).

**3.** This approach is troubling, because it would seem to allow recovery for persons who never sought access to the courts. The First Amendment guarantees meaningful access to the courts, not merely meaningful access to law books. Yet the *Jenkins* approach seems to say that if the limit of access to legal materials was direct, substantial, and continuous, a person need not show any prejudice suffered as a result. The requirement of prejudice simply vanishes; no longer is it a matter, as it was in *DeMallory v. Cullen,* 855 F.2d at 448–49, of presuming prejudice or finding prejudice inherent in the limitation. Presumptions can be over-

come by the defense, but dispensing of the requirement altogether forecloses that avenue. An inmate may prevail even if there was nothing he was interested in filing, or even if he never sought access to legal materials.

What such a plaintiff might win also is unclear. A § 1983 plaintiff generally must show damages caused by the constitutional deprivation. *Smith v. Chicago,* 913 F.2d 469 (7th Cir. 1990). It seems apparent that one who suffered no prejudice was caused no damages. Nominal damages arguably would be available to an inmate subjected to, but not prejudiced by, a substantial and continuous limitation on access to legal materials, but such a result seems unsound. Nominal damages are sensible if a constitutional right was violated but no damages were suffered, *see, e.g., Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978), but

the court is ambiguous, the issue turns on the burden of proof. Under *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), Mr. Gray must come forth with evidence sufficient to withstand a directed verdict motion to survive summary judgment, but he must do so only on those issues on which he would bear the burden of proof at trial. Language in several access cases, however, indicates that the defendants bear the burden of proving the adequacy of the means they provide. *Shango v. Jurich*, 965 F.2d at 292; *DeMallory v. Cullen*, 855 F.2d at 446; *Campbell v. Miller*, 787 F.2d at 225–26.

This language, however, cannot be read to mean that a plaintiff has no burden of proof whatsoever. Literal reading of the cases' language would lead to the absurd result that an inmate who files a sufficient complaint—that is, a complaint which does not demonstrate beyond doubt that he could prove no set of facts entitling him to recovery—would be required to do nothing to show a constitutional violation at trial.

▮ The court believes that the only sound reading of the cases requires the plaintiff to demonstrate the existence of a limitation on access to legal materials that could allow a trier of fact to find a constitutional deprivation; if, as here, the inmate cannot show prejudice, the showing must be sufficient to allow a trier of fact to find that the limitation was direct, substantial and continuing within the meaning of *Jenkins*. Upon such a showing, the burden of persuasion shifts to the defendants to demonstrate that the limitation shown by the plaintiff either did not exist or was adequate to satisfy First Amendment standards.

Under this approach, Mr. Gray cannot prevail. Perhaps because his attempts to avail himself of the system were so limited while he was on the A & O unit, Mr. Gray seems to have little grasp of the system made available to him. He testified that there was no physical library for prisoners

in the A & O unit. *See* Gray Dep., pp. 59–60. Although the A & O unit had some law books, the books were locked in storage. *Id.* When asked whether he requested assistance from the Writ room, Mr. Gray replied: "First a person has to know what books you want in order to do it." Gray Dep., p. 61. He also testified that, "I sent a request [to talk to someone in the Writ room] before, but it's been so long ago, I don't know who got it. I never heard anything from it." Gray Dep., p. 61. Mr. Gray testified that no person from the Writ room came to the A & O unit on a regular basis. Gray Dep., pp. 63–64. Finally, Mr. Gray testified that one time he sent a request to the Writ room for copies of a victim compensation law, but, in return, was sent copies of something unrelated to that request. Gray Dep., p. 69. He continued, "If you don't know the books you want which specifically you are looking for, there is just no way you can get the information." *Id.*

This information does not wholly contradict Mr. Hartley's description of the system of access to legal materials provided to A & O inmates. It is undisputed that inmates in the A & O unit could not go directly into the library. According to Mr. Hartley, inmates in the A & O unit could request legal books and documents (or copies) from the Writ room. *See* Hartley Dep., pp. 29–30. Apparently, an inmate would request a certain book or document and a person would bring the book or document (or copies thereof) to the inmate. Mr. Hartley also stated that the prison had people from the Writ room go to the particular units housing inmates in protective custody. *Id.* Thus, the defendants contend that Mr. Gray had access to legal materials even when housed in the A & O unit.

Mr. Gray has shown no more than that the system provided to A & O inmates failed on the one or two occasions he attempted to use it. A substantial and continuous limitation is "any restriction on

one who has not been denied access to the courts (and hence suffered no prejudice from the denial of access to law books) has not been denied access to the courts.

The facts of this case do not, however, require resolution of these doubts about the approach taken in *Jenkins v. Lane*.

counsel or legal materials that completely prevents the prisoner, or a person acting in the prisoner's behalf, from performing preliminary legal research." *Jenkins v. Lane*, 977 F.2d at 269. A system shown only to have failed once or twice does not reach such a level.

The court concludes that Mr. Gray would have the burden at trial of demonstrating the existence of a system that completely prevented the performance of preliminary legal research. Accordingly, in opposing the summary judgment motion, he bears the burden of coming forth with evidence sufficient to allow a trier of fact to so find. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Mr. Gray has not come forth with such evidence; the defendants are entitled to summary judgment on this claim.

### 2. Eighth Amendment

The defendants claim that they cannot be held responsible for any assault on Mr. Gray or any alleged lack of medical care because the defendants had no involvement in, or knowledge of, either event.

■■■ Individual liability under § 1983 must be based upon personal responsibility. *Archie v. Racine*, 847 F.2d 1211 (7th Cir. 1988), *cert. denied*, 489 U.S. 1065, 109 S.Ct. 1338, 103 L.Ed.2d 809 (1989); *Morales v. Cadena*, 825 F.2d 1095 (7th Cir.1987). A person may be held liable under § 1983 in his individual capacity only if he caused or participated in the constitutional deprivation; a "causal connection or affirmative" link between the conduct and the defendant must exist. *Wolf–Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir.1983). An official is personally involved if (1) he participated directly in the constitutional deprivation, (2) he acted, or failed to act, with reckless disregard of the plaintiff's constitutional rights, or (3) the conduct that deprived the plaintiff of his constitutional rights occurred at the official's direction or with his knowledge or consent. *Rascon v. Hardiman*, 803 F.2d 269, 274 (7th Cir.1986); *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir.1985). To constitute personal involvement sufficient for liability under § 1983, inaction requires more than motive or even

support and encouragement; it requires an act from which it may be inferred that the defendant assisted in the constitutional violation. *Kunzelman v. Thompson*, 799 F.2d 1172, 1175 (7th Cir.1986).

■■■ Further, it is not sufficient for a § 1983 plaintiff to show that a supervisory official was remiss in supervising the implementation of a policy in force in an institution. *Rascon v. Hardiman*, 803 F.2d at 273–74. Rather, to establish liability against a supervisory official, the plaintiff must establish that the official knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or failure to act. *Rascon v. Hardiman*, 803 F.2d at 274.

#### a. The February 1984 Assault

■■■ As stated above, Mr. Gray was assaulted on February 23, 1984 by a death row prisoner who had been transferred to the A & O unit for a few hours that day. The defendants claim that they had no personal involvement regarding the February 23 assault on Mr. Gray. Mr. Faulkner stated that he played no part in decisions to move any death row inmates to the A & O unit in February 1984; such matters were delegated to other staff members. Mr. Duckworth declared that he had no recollection of the assault on Mr. Gray in February 1984. Mr. Gray even admitted that he did not contact Mr. Duckworth or Mr. Faulkner regarding that assault.

Mr. Hartley testified that he knew nothing about the February 1984 assault on Mr. Gray before this suit was filed. Mr. Hartley also stated that he was not involved in making decisions concerning the temporary housing of death row inmates in the A & O unit. He further declared that he had no supervisory control over the A & O unit in February 1984.

Finally, the record indicates that death row inmates, on the whole, were no more dangerous than inmates in the general population. Correctional Officer Bradley Hutchinson testified that, in his opinion, death row inmates were not more violent than inmates in the general population.

Mr. Gray acknowledged that death row inmates were housed in the A & O unit without incident, both before and after the February 1984 assault.

In his response, Mr. Gray contends that "both defendants Hartley and Duckworth had to have some personal involvement in at least some of the evils." Mr. Gray claims that Mr. Hartley was in "apparent authority" of the A & O unit in February 1984, and that Jack Duckworth was the superintendent during the relevant period. Mr. Gray also appears to claim that the defendants violated his constitutional rights by transferring death row inmates to the A & O unit, and allowing the death row inmates to remain unhandcuffed in the A & O unit.

However, neither Mr. Faulkner or Mr. Hartley made the decision to move any death row inmates to A & O in February 1984. Even assuming that Mr. Duckworth had some part in the decision to move death row inmates to the A & O unit, that decision alone would not violate Mr. Gray's constitutional rights. The evidence shows that death row inmates were not more violent than inmates in the general population. Mr. Gray must establish that Mr. Duckworth knowingly, willfully, or at least recklessly caused the alleged deprivation by his action or failure to act. *Rascon v. Hardiman*, 803 F.2d at 274. Mr. Gray has not done so.

There is no evidence that the defendants had any personal involvement in the February 1984 assault upon Mr. Gray and, therefore, cannot be held liable.

### b. The September 1984 Assault

■ The second assault on Mr. Gray involved an inmate named Hegewood who was also housed in the A & O unit. During the assault, a "Signal 7" was called, and as many as eight or nine correctional officers entered the A & O unit to stop the assault. Mr. Gray admitted that Mr. Faulkner and Mr. Hartley had no involvement with the September 1984 assault, and nothing in the record suggests that Mr. Duckworth had any knowledge of any threat to Mr. Gray.

There is no evidence that the defendants had any personal involvement in the September 1984 assault upon Mr. Gray, and therefore, they cannot be held liable.

### c. Medical Care

Mr. Gray stated that his medical complaint concerned doctors, and that none of the defendants were involved in his medical care after the incidents. *See* Gray Dep., pp. 55–56. Therefore, defendants Faulkner, Duckworth, and Hartley cannot be held liable. *See Estelle v. Gamble*, 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs).

Even assuming that there was a minimal amount of personal involvement by one or more of the defendants in the general operation of the A & O unit, the defendants claim that the standards that have been established in Eighth Amendment cases require a much greater showing of wrongdoing by the defendants than is evidenced in the record.

■ The Eighth Amendment to the United States Constitution, which applies to the states through the Due Process Clause of the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes. *Wilson v. Seiter*, — U.S. —, —, 111 S.Ct. 2321, 2323, 115 L.Ed.2d 271 (1991). "Although the Supreme Court has never held that the Eighth Amendment requires the state to protect prisoners from each other, the duty to do so is a logical correlative of the state's obligation to replace the means of self-protection among its wards." *McGill v. Duckworth*, 944 F.2d 344, 347 (7th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1265, 117 L.Ed.2d 493 (1992). A prisoner's interest in safety does not lead to absolute liability, *McGill v. Duckworth*, 944 F.2d at 347, because the Eighth Amendment has a mental component. *Wilson v. Seiter*, — U.S. at —, 111 S.Ct. at 2325; *McGill v. Duckworth*, 944 F.2d at

347. Whether an injury inflicted by fellow prisoners is "punishment" depends upon the mental state of those who cause or fail to prevent the injury. *McGill v. Duckworth*, 944 F.2d at 347.

In *McGill v. Duckworth*, the defendants granted the plaintiff-inmate's request that he be placed in protective custody. The plaintiff was placed in a unit which, due to a lack of space, housed not only inmates in need of protection but also those on disciplinary segregation status. Soon after the plaintiff was placed in the unit, fellow inmates began harassing him. The plaintiff asked to be removed from the unit, but failed to tell prison officials about the other inmates' threats. On his third day in the unit, the plaintiff was sexually assaulted.

The district court instructed the jury that the defendants could be found liable if they knew or "should have known" that the plaintiff was at risk in the unit. *McGill v. Duckworth*, 944 F.2d at 348–49. The Seventh Circuit reversed, stating:

> It follows that the instructions to the jury were erroneous to the extent that they allowed the jury to find the defendants liable if they 'should have known' that McGill [the plaintiff] was at risk.... McGill had to show that the defendants had actual knowledge of the threat Ausley [the other inmate] posed, that the rape was readily preventable, but that instead of intervening the guards allowed Ausley to proceed. Proving (as the jury found McGill did) that the guards *should have known* of Ausley's threat is not enough.

*McGill v. Duckworth*, 944 F.2d at 349 (emphasis in original). Thus, to hold the defendants liable, Mr. Gray must prove that the defendants had actual knowledge of the threat that the death row inmates posed, that Mr. Gray's assaults were readily preventable, and that the defendants allowed the assaults to proceed. He has not done so.

Mr. Faulkner, Mr. Duckworth, and Mr. Hartley all affirmed that they did not recall, or were not aware, that any particular offender from death row posed any kind of imminent threat to Mr. Gray. The record indicates that death row inmates, on the whole, were no more dangerous than inmates in the general population. Thus, there is no evidence that the defendants had actual knowledge of the threat the death row inmates posed to Mr. Gray. Likewise, there is no evidence that the defendants had any knowledge of the threat that Mr. Hegewood posed to Mr. Gray.

Mr. Gray basically argues that the defendants "should have known" of the potential threats against him. For example, Mr. Gray claims that Mr. Hartley was on the block in apparent authority during the period of the assault on Mr. Gray. This argument amounts to speculation and does not establish that Mr. Hartley "knew" of the potential threats to Mr. Gray. In addition, by November 1983, Mr. Hartley had been assigned the position of Conduct Adjustment Board Chairman, and was no longer involved in the supervision of the A & O unit.

Mr. Gray contends that Mr. Duckworth was Superintendent of ISP, and therefore, he had to know of the harm that threatened Mr. Gray. Mr. Gray also maintains that there is sufficient evidence to put in front of a jury as to Mr. Duckworth's repeated orders to transfer the death row prisoners to the A & O unit. Even assuming that Mr. Duckworth played a part in such decisions, there is no evidence that Mr. Duckworth possessed knowledge of the threat that death row inmate Averhart posed to Mr. Gray.

Mr. Gray claims that Mr. Faulkner was aware that death row inmates repeatedly were moved to the A & O unit. As stated above, assuming this is true, there is no evidence that Mr. Faulkner knew of the threat of harm that the death row inmates posed to Mr. Gray. Further, Mr. Gray has cited no case law that holds the mere movement of death row inmates into a protective custody unit violates the Eighth Amendment.

 Mr. Gray must meet a significant burden in proving that the defendants had actual knowledge of the threat against him. A prisoner normally proves actual knowledge of impending harm by showing that

he complained to prison officials about a specific threat to his safety. *McGill v. Duckworth,* 944 F.2d at 349; *Santiago v. Lane,* 894 F.2d 218, 223–24 (7th Cir.1990). Mr. Gray has not shown that he complained to the defendants about any impending harm. Moreover, Mr. Gray's mere request for protective custody does not demonstrate the requisite knowledge. *McGill v. Duckworth,* 944 F.2d at 350. The defendants placed Mr. Gray in the A & O unit to protect him, not harm him. *McGill v. Duckworth,* 944 F.2d at 350.

In short, Mr. Gray has presented no facts that suggest that the defendants had any personal responsibility for the assaults upon him or the medical care provided him, or that the defendants had knowledge of the threat posed against him. Therefore, Mr. Gray's claim under the Eighth Amendment must fail.

### 3. Fourteenth Amendment

Mr. Gray also contends that while he was in the A & O unit, the defendants violated his right to equal protection by treating him differently than inmates in the general population. Mr. Gray affirmed that there were numerous differences between the rights and privileges he had in the A & O unit and the rights and privileges of general population inmates. For example:

—Prisoners in protective custody were not allowed to have any musical instruments, prisoners in the general population were not subject to the same restriction;

—Prisoners in protective custody were not allowed to have any hobby materials, prisoners in the general population were not subject to the same restriction;

—Prisoners in protective custody were prohibited from receiving food in cans or jars, prisoners in the general population were not subject to the same restriction;

—Prisoners in protective custody had no gymnasium nor access to a gymnasium, prisoners in the general population had the use of a gymnasium;

—Prisoners in protective custody had only a roof for outdoor exercise; prisoners in the general population had standard outdoor exercise;

—Prisoners in protective custody had no law library, prisoners in the general population had use of a law library;

—Prisoners in protective custody were prohibited from having radios or televisions, prisoners in the general population were not subject to the same restriction;

—Prisoners in protective custody were required to eat all their meals on trays resting on their knees in their cells, prisoners in the general population ate at tables with other prisoners;

—Prisoners in protective custody were prohibited from having religious services, prisoners in the general population had religious services.

Gray Aff., pp. 2–3.

■ Prisoners do not surrender their rights to equal protection at the prison gate, but unequal treatment among inmates is justified if it bears a rational relation to legitimate penal interest. *Williams v. Lane,* 851 F.2d 867, 881 (7th Cir.1988). The intentional disregard of a plaintiff's rights in adopting certain policies is tantamount to intentional discriminatory behavior. *Id.* To escape liability, the defendants must show that the unequal treatment of protective custody inmates had a rational basis in the legitimate interest of prison security. *Williams v. Lane,* 851 F.2d at 881; *French v. Owens,* 777 F.2d 1250, 1256 (7th Cir.1985), *cert. denied,* 479 U.S. 817, 107 S.Ct. 77, 93 L.Ed.2d 32 (1986).

In *Williams v. Lane,* the plaintiffs were protective custody inmates in an Illinois prison. Among other things, the plaintiffs alleged that the defendants violated their right to equal protection by failing to provide comparable programming and living conditions. For example, the general population inmates could attend communal worship services, classroom religious instructions, and private religious counseling; the plaintiffs received significantly inferior religious services. *Williams v. Lane,* 851 F.2d at 874. The plaintiffs also received inadequate and inferior library services when compared to the general population. *Williams v. Lane,* 851 F.2d at 874–75. Various vocational and educational programs offered the general population in-

mates were not afforded protective custody inmates. *Williams v. Lane*, 851 F.2d at 875. Finally, basic living conditions were not comparable. Protective custody inmates had to eat their meals in their room, and were served unheated, unpalatable food. *Id.* Protective custody inmates had no indoor recreational facilities, and what recreational opportunities they had were poor. *Id.*

The court of appeals affirmed the district court's determination that the defendants violated the plaintiffs' equal protection rights. *Williams v. Lane*, 851 F.2d at 882. Specifically, the court stated that the defendants "failed to establish the necessary relationship between prison security and disparate treatment of residents in protective custody". *Williams v. Lane*, 851 F.2d at 881.

*Williams v. Lane* is on point. Mr. Gray has alleged facts establishing that his rights while in the A & O unit were unequal to rights possessed by the general population. The defendants contend that Mr. Gray has no viable equal protection claim because he was treated similarly to other inmates in the A & O unit. This argument appears to miss the basis of Mr. Gray's claim: while he was in the A & O unit, he was treated differently from the general population inmates without a rational basis for the difference.

 The defendants cite two cases to support their position, but neither is on point.[4] In one short sentence, the defendants contend "[m]oreover, protection of those housed on A & O required different treatment." This one sentence does not establish that the unequal treatment of Mr. Gray (while in the A & O unit) as compared

to the general population inmates had a rational relation to legitimate penal interest. *Williams v. Lane*, 851 F.2d at 881. The defendants have not presented facts establishing that the unequal treatment of Mr. Gray was rationally related to a legitimate security or penal interest. The defendants' motion for summary judgment with respect to Mr. Gray's equal protection claim must be denied.

## IV.

On November 18, 1992, Mr. Gray filed a motion for partial summary judgment. His motion was filed after the briefing on the defendants' motion for summary judgment had concluded. The defendants objected to Mr. Gray's motion, and asked that it be stricken as untimely.

On July 31, 1992, this court extended the time for filing dispositive motions to August 31, 1992. After noting the length of time this case has been pending, the court instructed the parties that "no further extensions would be granted save for extraordinary reasons." Mr. Gray has presented no reason, let alone an extraordinary reason, for the late filing of his motion for summary judgment. Mr. Gray could have filed his motion for partial summary judgment in connection with his response to the defendants' motion for summary judgment, but he failed to do so.

Because Mr. Gray has not presented any extraordinary reason for the late filing of his motion for summary judgment, his motion will be stricken.

## V.

Accordingly, the court ORDERS that:

---

**4.** The defendants cite *Norvell v. Illinois*, 373 U.S. 420, 423, 83 S.Ct. 1366, 1368, 10 L.Ed.2d 456 (1963), where the Court held that "a State, in applying *Griffin v. Illinois* [351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956),] to situations where no transcript of the trial is available due to the death of the court reporter, may without violation of the Due Process or Equal Protection Clause deny relief to those who, at the time of trial, had a lawyer and who presumably had his continuing services for purposes of appeal and yet failed to pursue an appeal." The applicability of *Norvell* to this case is not readily apparent.

The defendants also cite *French v. Heyne*, 547 F.2d 994, 998 (7th Cir.1976), where the court held that the "[d]efendants' assertion that the distinction drawn between prisoners with short indeterminate sentences and those with longer indeterminate and determinate sentences is rational on its face ... is also without merit." Similarly, the defendants' contention in the instant case that a distinction drawn between protective custody inmates and general population inmates is rational on its face is without merit.

(1) The defendants' motion for summary judgment as to Mr. Gray's claims for injunctive relief is GRANTED.

(2) The defendants' motion for summary judgment as to damages in their official capacities is GRANTED.

(3) The defendants' motion for summary judgment as to Mr. Gray's claim that the defendants violated his First Amendment right of access to the courts is GRANTED.

(4) The defendants' motion for summary judgment as to damages for Mr. Gray's claims arising under the Eighth Amendment is GRANTED.

(5) The defendants' motion for summary judgment as to Mr. Gray's claims that the defendants violated his right to the equal protection of the laws is DENIED.

(6) The plaintiff's motion for summary judgment is DENIED.

SO ORDERED.